## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOELLEN LYONS DILLON,                          Civil Action

              Plaintiff,                          No.

    vs.

REED SMITH, LLP,

              Defendant.                          JURY TRIAL DEMANDED

## CIVIL COMPLAINT

Plaintiff, JoEllen Lyons Dillon, by undersigned counsel files this Civil Complaint and in support alleges the following.

### I. Jurisdiction

1.      The Jurisdiction of this Court is invoked pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-5(f)(3); Section 16(b) of the Fair Labor Standards Act of 1938, 29 U.S.C. §216(b), incorporating by reference the Equal Pay Act of 1963, 29 U.S.C. §206(d); the Family and Medical Leave Act (FMLA), 29 U.S.C. §2617;  28 U.S.C. §§1331, and 1343(a)(3).

2.      Plaintiff has satisfied all the procedural and administrative requirements set forth in Section 706 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e-5, and in particular:

      a.      She filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission on March 1, 2010;

      b.      She received a Notice of Right to Sue from the EEOC on October 19, 2010; and

      c.      This Complaint is filed within 90 days of receipt of that notice.

## II.  The Parties

3.      Plaintiff, JoEllen Lyons Dillon, is an adult female individual who resides at 1330 Bennington Avenue, Pittsburgh, Pennsylvania 15217.  Dillon is an attorney who has been licensed to practice in the Commonwealth of Pennsylvania since 1988.  She is employed by Defendant as a fixed share partner, also known as a  Non-Equity Partner.

4.      Defendant, Reed Smith, LLP is a law firm employing more than 1600 attorneys throughout the world.  Its Pittsburgh office, located at 225 Fifth Avenue, Pittsburgh, Pennsylvania 15222, employs more than 190 attorneys.

5.      Defendant is an employer as defined by 29 U.S.C. §2611(4) in that Defendant is engaged in an industry or activity affecting commerce and employs more than 50 employees within 75 miles of its Pittsburgh office.  Defendant is also an Employer within the meaning of 42 U.S.C. §2000e(b), in that it employs more than 15 employees.

## III. Factual Background

6.       In February 2002, Defendant hired Dillon, along with two male attorneys, from another large Pittsburgh law firm, where Dillon was an Equity Partner.

7.      Dillon, along with the two male attorneys, joined Defendant's Pittsburgh office as Non-Equity Partners.

8.      A Non-Equity Partner is an employee, holding a higher rank than an associate attorney, who does not have an ownership interest in the firm and does not share in its profits.  An Equity Partner, on the other hand, holds an ownership interest in the firm and shares in its profits.

9.      Defendant offered the two male attorneys starting salaries $50,000 higher than it offered to Plaintiff.  After the two male attorneys refused to accept employment with Defendant

unless Dillon was paid equally to them, Defendant agreed to pay Dillon the additional $50,000.

10.     While the two male attorneys who joined the firm with Dillon were promoted to Equity Partner within a year and a half after joining Reed Smith, Dillon is still not an Equity Partner.

11.     Defendant's legal practice is operationally divided into two departments: Business & Finance and Litigation.

12.     Dillon works in Defendant's Corporate & Securities practice group of Defendant's Business & Finance Department.

13.     In the past decade, Defendant has not promoted any women to Equity Partner in its Pittsburgh office's Corporate & Securities group.

14.     Reed Smith's practice revolves around what it calls "institutional clients"–that is clients who have retained the law firm for a long while and are not particularly affiliated with one partner or another.

15      Because of this, associates and Non-Equity Partners must keep in the good graces of their supervising partners to acquire and obtain work for which billable hours can be earned.

16.     Despite repeated requests, Dillon received little if any work other than her own self-generated work.

17.      Instead, work was diverted to male Non-Equity partners and, in the case of Defendant's Pittsburgh Corporate and Securities Group, to female attorneys who were willing to engage in sexual relations with members of Defendant's management or with whom members of Defendant's management had sought to engage in such relations.

18.     Dillon did not engage in such relations with members of Defendant's management, and, to her knowledge, members of Defendant's Management did not seek to engage in such

3

relations.

19.     This atmosphere was known or reasonably suspected by Defendant's management, including Global Managing Partner Greg Jordan.

20.     Despite this, Defendant has permitted those male partners who have sought to engage in sexual relations with female attorneys to continue to maintain supervisory responsibility over female attorneys.

21.     Indeed, in a recent survey of "top law firms"–which Defendant's management encouraged its attorneys to participate in–Reed Smith attorneys  described the atmosphere as a "boys' club."

22.     In this management-encouraged survey, a  Reed Smith attorney noted she had been "sexually propositioned by male lawyers at the firm." Another noted that: "firm management tolerates sexual relationships between members of management and young associates with whom they work. There is a perception among associates that such associates benefit from these relationships when work is assigned (and they are probably right)."

23.     A senior associate described an atmosphere where the contributions of female attorneys are judged by their acceptance of the male management's sexual actions:

> "I have seen older male partners hitting  on and flirting shamelessly with younger female lawyers. There is a frat-like atmosphere with some men advancing because they play the right sports and tell dirty jokes."

24.     This atmosphere has had a profound effect on the career advancement and pay of female Reed Smith  associates and Non-Equity Partners.

25.     Defendant's senior management, including Jordan knew, or should have known,  of the above described atmosphere and its effect on Reed Smith female associates and Non-Equity

4

Partners.

26.     Defendant's Pittsburgh office's Business and Finance Department has 23 male equity partners, but only 3 women equity partners.

27.     In 2007, the seven female Equity Partners in Defendant's Pittsburgh office  on average earned $129,000.00 per year less than the 49 male Equity Partners.

28.     On information and belief this disparity has continued to this day.

29.     Dillon performs work requiring substantially equal skill, effort, and responsibility as male Equity and non-Equity Partners.

30.     Throughout Dillon's employment, she has generated substantial business for Defendant.  For example, Dillon has consistently collected over $1 million per year as the "Client Responsible Attorney" ("CRA").  In 2006 and 2007, Dillon collected over $3 million per year in "CRA."

31.     According to Defendant's website, Dillon:

> provides practical advice to executives and entrepreneurs, enabling them to not only understand the priority of business and legal issues facing their company but ultimately to make solid judgments as well. Her commitment and practical approach to helping clients "get the deal done" makes her a valuable business partner. JoEllen's experience ranges from advising startup technology and entrepreneurial businesses – helping them grow by raising capital and issuing securities – to advising large public companies on a variety of issues, including mergers, acquisitions and contests for control.

32.     Although Dillon has not been made Equity Partner, male attorneys who have generated the same amount–or even less–business for Defendant, have been promoted to Equity Partner.

33.     Dillon discussed her compensation and status as a Non-Equity Partner multiple times with various members of management, including the then-Chair of the Business and Finance

Department, David Deninno.  Defendant's management told Dillon she would be endorsed by the Corporate and Securities practice group and the department  to become Equity Partner.

34.      In the fall of 2006, Dillon again was not promoted for the calendar year 2007, even though reports showed she was the second-highest CRA for Non-Equity Partners in the entire firm.

35.      In a 2006 self-evaluation, Dillon wrote, "here I am a woman achieving what the firm is saying is its goal for women practicing here, and I have not been promoted, nor have I been paid equally to others for similar efforts."

36.      Dillon complained to DeNinno that although she had been promised that her department and  practice group would endorse her, Defendant instead promoted a man from her practice group.  Dillon also told Deninno it was unfair that other men had been promoted, while she was not.

37.      In the fall of 2007, Dillon again was not promoted to Equity Partner for 2008, even though she collected $3.5 million in CRA.

38.      Dillon discussed her compensation and her lack of promotion with DeNinno once again.

39.      In a February 27, 2008 appeal to her compensation, Dillon stated in part:

> "I have a valuable talent for this firm–I am a woman lawyer who consistently has strong relationships with top tier clients and potential clients.  We say that is a goal for our young lawyers–but here I already sit.  We do not have many of me in this market, certainly not in B&R.  So all I am asking is that my value not be overlooked by our system."

40.      In 2008, Dillon was pregnant with twins.  From September 2008 to January 2009, Dillon took leave pursuant to the FMLA for the birth of her twins.

41.      In the twelve months prior to her leave, Dillon worked more than 1250 hours, and had

6

been employed by Defendant for over one year.  She was therefore an "eligible employee" as defined by the FMLA, 29 U.S.C. §2611(2)(A).

42.     Although Dillon was on bed rest and then leave for the final three months of 2008, she still collected more than $2.1 million in CRA that year.

43.     When Dillon returned from leave in January 2009, her total compensation decreased by almost half.

44.     Dillon appealed her compensation, stating in part:

> "I hear about how we need to assist women in their efforts to develop business, and here I am doing it without anyone assisting me .... I was on maternity leave and some portion of modified bed rest last year, [and] I think it is extremely disturbing that I am even writing this appeal."

45.     In January 2009, Dillon complained to DeNinno, that her compensation was cut because of her maternity leave.  She also complained that she had not been promoted.

46.     In response, Deninno asked Dillon if she was "done having babies."  He also said he had tried to raise Dillon's profile, but did not know she was pregnant and going to be out on maternity leave.

47.     DeNinno's response to Dillon is not atypical. Defendant creates and permits an atmosphere in its Pittsburgh office, and specifically in its Corporate & Securities Group, that treats women differently because of their gender.

48.     Dillon also met with Managing Partner Greg Jordan and stated her compensation should not have been cut while she was on maternity leave. Jordan praised Dillon's ability and contributions, but changed the subject when she tried to discuss promotion and compensation. Jordan also informed Dillon her compensation appeal had been denied.

49.     In the fall 2009, Defendant again failed to promote Dillon to Equity Partner for the

upcoming year.

50.     In December 2009, Dillon complained both to Vice Chair of the Business and Finance Department John Iino, and in a written self-evaluation, that she should not have had her compensation cut because of her maternity leave.  She also wrote in her December 4, 2009 self evaluation, "I have not been promoted to equity partner while other people, particularly men, have been promoted while I have outperformed or equally performed with them."

51.     In January 2010, Defendant reduced Dillon's compensation by another $100,000, and set her compensation lower than the compensation for similarly-situated males who do work requiring substantially equal skill, effort, and responsibility.

52.     On January 21, 2010, Dillon appealed Defendant's compensation decision.

53.     On January 22, 2010, Dillon was informed that her appeal was denied, and her compensation would not be changed.

54.     On March 1, 2010, Dillon filed a charge of discrimination with the EEOC.  Despite requests from the EEOC for a written position statement, Defendant failed to respond to Dillon's charge.

## Count I
## Title VII: Gender Discrimination

55.     Plaintiff incorporates by reference paragraphs 1 through 54 as if fully restated.

56.     From the fall of 2009 to present, Defendant failed to promote Dillon because of her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1).

57.     Defendant's actions were done with malice or reckless indifference to Plaintiff's federally protected rights.

58.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered, and

continues to suffer, lost wages and benefits, as well as humiliation, inconvenience, mental distress and embarrassment.

WHEREFORE, Plaintiff demands judgment against Defendant for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1), as follows:

a.  That Defendants be ordered to instate Plaintiff into the position she would occupy but for Defendant's discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

b.  That Defendant be required to compensate Plaintiff for the full value of wages she would have received had it not been for Defendant's illegal treatment of Plaintiff, with interest until the date Plaintiff is offered employment into a position substantially equivalent to the Non Equity Partner position;

c.  That Defendant be required to provide Plaintiff with front pay if the Court determines instatement is not feasible;

d.  That Defendant be required to compensate Plaintiff for lost benefits, including profit sharing and/or pension benefits until Plaintiff's normal retirement date;

e.  That Plaintiff be awarded compensatory damages in an amount to be determined at trial;

f.  That Defendant be enjoined from discriminating or retaliating against Plaintiff in any manner prohibited by Title VII;

g.  That Plaintiff be awarded against Defendant the costs and expenses of this litigation, including a reasonable attorneys fee; and

h.  That Plaintiff be granted such further legal and equitable relief as the Court may deem just and proper.

**Count II**
**Title VII: Retaliation**

59.  Plaintiff incorporates by reference paragraphs 1 through 58 as if fully restated.

60.  Defendant failed to promote Dillon in the fall of 2009; cut her compensation in

January 2010, and otherwise discriminated against her in the terms, conditions, and privileges of employment, because she opposed gender and pregnancy discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a).

61.     Defendant's actions were done with malice or reckless indifference to Plaintiff's federally protected rights.

62.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered, and continues to suffer, lost wages and benefits, as well as humiliation, inconvenience, mental distress and embarrassment.

WHEREFORE, Plaintiff demands judgment against Defendant for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1), as follows:

a.     That Defendants be ordered to instate Plaintiff into the position she would occupy but for Defendant's discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

b.     That Defendant be required to compensate Plaintiff for the full value of wages she would have received had it not been for Defendant's illegal treatment of Plaintiff, with interest until the date Plaintiff is offered employment into a position substantially equivalent to the Equity Partner position;

c.     That Defendant be required to provide Plaintiff with front pay if the Court determines instatement is not feasible;

d.     That Defendant be required to compensate Plaintiff for lost benefits, including profit sharing and/or pension benefits until Plaintiff's normal retirement date;

e.     That Plaintiff be awarded compensatory damages in an amount to be determined at trial;

f.     That Defendant be enjoined from discriminating or retaliating against Plaintiff in any manner prohibited by Title VII;

10

g.      That Plaintiff be awarded against Defendant the costs and expenses of this litigation, including a reasonable attorneys fee; and

h.      That Plaintiff be granted such further legal and equitable relief as the Court may deem just and proper.

### Count III
### Equal Pay Act

63.     Plaintiff incorporates by reference paragraphs 1 through 62 as if fully restated.

64.     During the period December 2007 to present, Defendant violated the Equal Pay Act, 29 U.S.C. §206(d), by paying wages to Dillon, a woman, at rates less than the rates it pays male Equity and Non-Equity Partners in the same establishment for equal work on jobs requiring equal skill, effort and responsibility, and performed under similar working conditions.

65.     Defendant's violation of the Equal Pay Act was willful.

WHEREFORE, Plaintiff demands judgment against Defendant and damages as follows:

a.      The difference between the wages actually received by Ms. Dillon and the wages paid to male employees for equal work within the meaning of the Equal Pay Act;

b.      Liquidated damages, in an amount equal to the back wages due and owing, pursuant to 29 U.S.C. §§216(b), and 206(d)(3);

c.      An award of prejudgment interest;

d.      An award of reasonable attorney fees and costs, pursuant to 29 U.S.C. §216(b); and

e.      Any and all such other additional relief as the Court finds to be just and equitable.

### Count IV
### Equal Pay Act: Retaliation

66.     Plaintiff incorporates by reference paragraphs 1 through 65 as if fully restated.

67.     Plaintiff's internal complaints that her compensation was lower than that of similarly-

11

situated men were complaints within the meaning of the FLSA, 29 U.S.C. §215(a)(3), which incorporates by reference the Equal Pay Act ("EPA").

68.     Defendant failed to promote Dillon, continued to pay her substantially less than similarly-situated men, and otherwise discriminated against her in the terms, conditions, and privileges of her employment, in retaliation for her complaints, in violation of 29 U.S.C. §215(a)(3).

69.     Defendant's violation of the FLSA/EPA was intentional and undertaken with reckless indifference to Ms. Dillon's right to not be retaliated against for complaining of EPA violations.

WHEREFORE, Plaintiff demands judgment as follows:

a.      That Defendant be ordered to instate Plaintiff into the position would occupy but for Defendant's illegal actions, with all benefits including, but not limited to wages, benefits, training and seniority;

b.      That Defendant be required to compensate Plaintiff for the full value of wages she would have received had it not been for Defendant's illegal treatment of her, with interest until the date she is offered employment into a position substantially equivalent to the Equity Partner position;

c.      That Defendant be required to provide Plaintiff with front pay;

d.      That Defendant be required to compensate Plaintiff for lost benefits, including profit sharing and/or pension benefits;

e.      That Defendant be ordered to pay Plaintiff compensatory damages for the emotional stress; inconvenience and humiliation she suffered because of Defendant's actions, pursuant to 29 U.S.C. §216(b);

f.      That, pursuant to 29 U.S.C. §216(b), Plaintiff be awarded punitive damages in an amount sufficient to deter Defendant from further retaliation against its employees who assert EPA rights;

g.      That Defendant be enjoined from retaliating against Plaintiff in any manner that violates the FLSA and/or EPA;

h.      That Plaintiff be awarded against Defendant the costs and expenses of this litigation and a reasonable attorney fee; and

i.       That Plaintiff be granted such further legal and equitable relief as the Court may deem just and proper.

## Count V
## FMLA: Interference

70.     Plaintiff incorporates by reference paragraphs 1 through 69 as if fully restated.

71.     From September 2008 to January 2009, Dillon took leave for the birth and care of her newborn children, and therefore exercised rights protected by the FMLA, 29 U.S.C. §2612(a)(1)(A).

72.     The FMLA, 29 U.S.C. §2615(a)(1) and 29 C.F.R. § 825.220(c), precludes employers from discriminating against employees who have exercised rights under the FMLA by taking FMLA leave.

73.     Defendant failed to promote Dillon, cut her compensation, and otherwise discriminated against her in the terms, conditions, and privileges of employment, because she took FMLA leave, in violation of 29 U.S.C. §2615(a)(1) and 29 C.F.R. § 825.220(c).

74.     As a direct and proximate result of Defendant's violations of the FMLA, Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost wages, benefits and seniority.

WHEREFORE, Plaintiff hereby requests judgment, pursuant to 29 U.S.C. § 2617(a), and the following legal and equitable remedies:

a.       Defendant be ordered to instate Plaintiff to the position she would occupy but for Defendant's illegal actions, together with all benefits incident thereto, including by not limited to, wages, benefits, training, and seniority;

b.       Defendant be required to compensate Plaintiff for full value of wages and benefits that Plaintiff would have received had it not been for Defendant's illegal treatment of Plaintiff, with interest at the prevailing rate thereon until the date Plaintiff is offered instatement to a position substantially equivalent

to the Equity Partner position;

c.     Defendant be required to provide Plaintiff all other compensation, including but not limited to lost stock options, bonuses, 401k and profit sharing, which was denied or lost to Plaintiff as a result of Defendant's illegal treatment of Plaintiff;

d.     That a final judgment in favor of Plaintiff and against Defendant be entered for Plaintiff for liquidated damages, as provided by 29 U.S.C. § 2617(a)(1)(A)(iii), in an amount equal to the wages, benefits, and other compensation denied or lost to Plaintiff;

e.     That Defendant be enjoined from discriminating against Plaintiff in any manner that violates the FMLA;

f.     That Plaintiff be awarded against Defendant the costs and expenses of this litigation and a reasonable attorney's fee; and

g.     That Plaintiff be granted such further legal and equitable relief as the Court may deem just and proper.

### Count VI
### FMLA: Retaliation

75.     Plaintiff incorporates by reference paragraphs 1 through 74 as if fully restated.

76.     Dillon also opposed a violation of the FMLA when complaining in January 2009 that her compensation had been cut, and she had not been promoted, because of her maternity leave.

77.     The FMLA, 29 U.S.C. §215(a)(2), precludes employers from retaliating against employees who have opposed violations of the FMLA.

78.     Defendant failed to promote Dillon, cut her compensation, and otherwise discriminated against her in the terms, conditions, and privileges of employment, because she opposed Defendant's violation of the FMLA, in violation of 29 U.S.C. §2615(a)(2).

79.     As a direct and proximate result of Defendant's violations of the FMLA, Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost wages, benefits and

seniority.

WHEREFORE, Plaintiff hereby requests judgment, pursuant to 29 U.S.C. § 2617(a), and the following legal and equitable remedies:

a. Defendant be ordered to instate Plaintiff to the position she would occupy but for Defendant's illegal actions, together with all benefits incident thereto, including by not limited to, wages, benefits, training, and seniority;

b. Defendant be required to compensate Plaintiff for full value of wages and benefits that Plaintiff would have received had it not been for Defendant's illegal treatment of Plaintiff, with interest at the prevailing rate thereon until the date Plaintiff is offered instatement to a position substantially equivalent to the Equity Partner position;

c. Defendant be required to provide Plaintiff all other compensation, including but not limited to lost stock options, bonuses, 401k and profit sharing, which was denied or lost to Plaintiff as a result of Defendant's illegal treatment of Plaintiff;

d. That a final judgment in favor of Plaintiff and against Defendant be entered for Plaintiff for liquidated damages, as provided by 29 U.S.C. §2617(a)(1)(A)(iii), in an amount equal to the wages, benefits, and other compensation denied or lost to Plaintiff;

e. That Defendant be enjoined from discriminating against Plaintiff in any manner that violates the FMLA;

f. That Plaintiff be awarded against Defendant the costs and expenses of this litigation and a reasonable attorney's fee; and

g. That Plaintiff be granted such further legal and equitable relief as the Court may deem just and proper.

Respectfully submitted,

**Samuel J. Cordes & Associates**

/S/ Samuel J. Cordes
Samuel J. Cordes
Christine T. Elzer

Pa. I.D. No. 54874 (Cordes)
Pa. I.D. No. 208157 (Elzer)

245 Fort Pitt Boulevard
Pittsburgh, PA 15222
(412) 471-8500

Attorneys for Plaintiff

16